IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| MEDTRONIC, INC. | ) | |
| | ) | |
| Plaintiff; | ) | |
| | ) | |
| v. | ) | Case No. 2:23-cv-02497 |
| | ) | |
| THE UNITED STATES DEPARTMENT | ) | |
| OF VETERANS AFFAIRS, a Federal | ) | |
| Agency; | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEDTRONIC, INC.'S COMPLAINT
## FOR DECLARATORY, INJUNCTIVE AND OTHER RELIEF

Plaintiff Medtronic, Inc. ("Medtronic") hereby submits this Complaint under the Administrative Procedure Act and requests an Order from the Court compelling Defendant United States Department of Veterans Affairs to produce certain documents and information to Medtronic.

## NATURE OF CLAIM

1. This is an action brought against the United States Department of Veterans Affairs (the "VA") due to its refusal to produce certain documents and information in response to Medtronic's *Touhy* requests and in response to a prior Court Order in an earlier, related APA action. These requests were made in connection with *qui tam* litigation pending before the United States District Court for the District of Kansas, *U.S. ex rel. Schroeder v. Medtronic, Inc., et al.*, No. 2:17-cv-02060-DCC-BGS. The United States is the real party in interest in that litigation, and events at the VA are central to the matter. Indeed, the alleged false claims are invoices sent by Defendants to the VA for medical services and devices and paid by the VA. As such, the VA is in exclusive possession of documents and information relevant to Medtronic's defenses in that

case, namely what VA knew about the medical procedures at issue and how it evaluated the appropriateness of those procedures.

2.      In the *qui tam* action, Relator Thomas Schroeder alleges, among other things, that Medtronic and its co-defendant, Wichita Radiological Group ("WRG"), filed or caused others to file claims that were false or fraudulent because they related to allegedly inappropriate and unnecessary medical treatment to veterans under the VA's care.  Relator brings these claims on behalf of the United States government.  Medtronic has learned, however, that the VA supervised the procedures, had access to the relevant VA medical records, and conducted its own contemporaneous and subsequent reviews of the medical procedures at issue.  Based on information and belief, the government consistently determined that the procedures generally were appropriate, did not harm patients as Relators has claimed, and were consistent with the VA's expectations.

3.      Indeed, after months of VA delay, including the VA's assertion of a claim of privilege as a basis for refusing to produce the records, on October 17, 2023, the VA decided to reverse course and produce records related to a more recent, post-litigation Clinical Episode Review Team (CERT) review that was completed in July 2023.  The CERT review involved a panel of nurses who reviewed every peripheral vascular procedure performed at the Robert J. Dole VA (the VA center at issue, hereafter "Dole VA") between 2015 and 2018.  Of those, 56 were sent for further review by physicians.  After reviewing all 56, the physicians on the CERT team identified ***"no evidence of patient harm related to the use or overuse of Medtronic devices."*** They also found the cases, in general, to be "complex" and found that the providers "demonstrated a high level of technical proficiency."  *See* Exhibit A (emphasis added).

4.      Indeed, Patrick C. Malloy, M.D., FSIR, the Executive Director of the National Radiology Program, wrote to the CERT team that of the 8 cases he reviewed:

> Each of the 8 procedures were determined to meet or exceed the standard of care by unanimous consensus of the panel in all aspects reviewed. The panel noted that multiple cases were performed in the clinical setting of critical limb ischemia with limb jeopardy, where extensive interventions converted the outcome favorably to limb salvage. ***The review did not substantiate concerns that providers were inappropriately or disproportionately using a specific commercial product from a specific vendor.*** Due to the complexity of the cases reviewed, a variety of products and devices were utilized including atherectomy devices, stents and balloons. In each case device selection was determined to be appropriately indicated by the clinical history and angiographic findings.

*See* Exhibit B (emphasis added).   However, even though the VA has now produced these records, it has done so with significant redactions, including redacting patient-identifying information that is critical to Medtronic's defense in the *qui tam* action.

5.      This evidence plainly and directly rebuts the allegations made by Relator, in the name of the United States—without personal knowledge or any good faith basis—that nearly every interventional procedure performed by WRG physicians from 2014 to 2018 was medically unnecessary and, therefore, any claims for payment associated with the devices and professional services used in those procedures were fraudulent.   However, additional, contemporaneous evidence exists that is similarly critical to the defense, both as it may provide further evidence of legal compliance and because it covers earlier at-issue time periods.   Namely, VA personnel testimony indicates that there is additional evidence reflecting VA supervision, review, and ratification of the procedures at issue, thereby refuting Relator's allegations that payments were made based on false claims.   Yet the United States still refuses to produce these key documents and information reflecting its internal reviews of the care at issue, while also permitting Relator to advance false and inflammatory allegations against Medtronic in the United States' name.

6.     Pursuant to the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.* (the "APA"), Medtronic seeks judicial review of several decisions by the VA refusing to produce documents to Medtronic.  In particular, Medtronic seeks production of the following: (1) documents reflecting contemporaneous monthly reviews of procedures at issue; (2) other contemporaneous quality assurance review documents; (3) documents showing the VA is still sending patients to WRG physicians for treatment; (4) removal of redactions from newly-produced documents; and (5) information regarding documents that likely support Medtronic's defense that the VA now claims may have been destroyed as recently as 2022, at the same time the VA itself was investigating the claims made by Relator on its behalf.  The VA's refusal to produce these records is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

7.     The Court previously determined that the VA's refusal to produce documents related to the *qui tam* matter was arbitrary and capricious.  *Schroeder v. U.S. Dep't of Veterans Affs.*, No. 2:22-cv-2209-DDC-KGG, Dkt. No. 53 (D. Kan.) (filed May 16, 2023).  On remand, the VA again refused to produce highly material and case critical documents, this time based on a new assertion that the records are protected by a statutory privilege.  However, the VA has never provided any substantiation for the privilege asserted.  When coupled with the VA's failure to produce relevant information and documents even in the absence of such objections, including by withholding material responsive to Medtronic's multiple *Touhy* requests, apparently destroying evidence it had a duty to preserve, and ceasing to communicate with counsel about certain documents or information sought, Medtronic reluctantly has been forced to file this action to protect its rights to obtain favorable evidence.

8.     Medtronic therefore requests that the Court again set aside the VA's action and hold that the VA's refusal to produce the records at issue is arbitrary, capricious, and contrary to law.

And, in light of the VA's recalcitrance and the imminent discovery deadlines in the related *qui tam* litigation, Medtronic asks that the Court compel the VA to produce the requested documents and information.

## PARTIES

9.    Plaintiff Medtronic, Inc. is a Minnesota corporation with its principal place of business in Minnesota.

10.    The United States Department of Veterans Affairs is a federal agency that operates at office locations within this judicial district.

## JURISDICTION AND VENUE

11.    Jurisdiction is proper pursuant to 28 U.S.C. § 1331.  The Court has authority to review the matter pursuant to the Administrative Procedure Act, 5 U.S.C. § 551, *et seq*.

12.    Venue is proper under 28 U.S.C. § 1391 because the central corpus of documents and information sought under Medtronic's *Touhy* requests relates to the Dole VA located in Wichita, Kansas, and is therefore located within this judicial district.

13.    This Court can grant declaratory and injunctive relief under Federal Rules of Civil Procedure 57 and 65, 28 U.S.C. § 2201 and § 2202, and 5 U.S.C. §§ 701-706.

## BACKGROUND

14.    Thomas Schroeder, in the capacity of "Relator," brought a *qui tam* action on behalf of the United States in the United States District Court for the District of Kansas, in the pending matter of *U.S. ex rel. Schroeder v. Medtronic, Inc., et al.*, No. 2:17-cv-02060-DCC-BGS.  The Relator was never a Medtronic employee, and as such, never had insider information.  Instead, he worked for a Medtronic competitor.  The United States, after reviewing Relator's allegations, declined to intervene in that *qui tam* action.  Medtronic is named as a defendant in that action.

15.     In the *qui tam* action, Relator alleges violations of the False Claims Act, 31 U.S.C. § 3729, *et seq.*, which Medtronic vigorously denies.

16.     In the *qui tam* action, among other things, Relator alleges that Medtronic presented, or caused to be presented, claims to the United States that were false or fraudulent in violation of the False Claims Act because Medtronic allegedly caused another defendant, Wichita Radiological Group ("WRG"), to provide unnecessary medical treatment at the Dole VA.  Medtronic contends that Relator's theories and allegations are meritless.

**Medtronic's First *Touhy* Requests to the VA and the First APA Action**

17.     Beginning in 2022, Relator and Medtronic sought fact discovery from the VA related to Relator's claims in the *qui tam* action.

18.     Under the federal housekeeping statute, 5 U.S.C. § 301, a federal agency may adopt procedures, known as *Touhy* regulations, for responding to requests for testimony or documents. *See United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951).

19.     The VA has promulgated its *Touhy* procedures for the "production or disclosure of official information or records of the Department of Veterans Affairs (VA)."  38 C.F.R. § 14.800 *et seq*.

20.     When these regulations apply,[1] a party seeking documents or testimony from the VA must comply with the regulations by making a proper request, including "a written statement

---

[1] By their own terms, the VA's *Touhy* regulations do not apply to any "[l]egal proceedings in which the Department of Veterans Affairs, the Secretary of Veterans Affairs or the United States is a party, is represented, or has a direct and substantial interest."  38 C.F.R. § 14.801(b)(2)(i).  As the real party in interest in Schroeder's *qui tam* action and the main beneficiary of any monetary recovery in that action, the United States has a direct and substantial interest in the *qui tam* action. The VA, too, has a direct and substantial interest, as the *qui tam* action directly implicates the appropriateness of medical care that was provided to veterans under the auspices of the VA. However, in an effort to avoid litigation over the issue, which could further delay Medtronic's effort to obtain highly relevant and dispositive evidence undermining the claim brought on behalf

by the party seeking the testimony or records or by the party's attorneys, [along with] a summary of the nature and relevance of the testimony or records sought in the legal proceedings containing sufficient information for the responsible VA official to determine whether VA personnel should be allowed to testify or records should be produced."  38 C.F.R. § 14.805.

21.    The regulations provide 15 factors for the VA to consider in making the determination whether to produce the requested information.  38 C.F.R. § 14.804.

22.    The regulations provide that after due consideration and consultation, "the VA official shall determine in writing whether the individual is required to comply with the demand or request and shall notify the requester or the court or other authority of the determination reached where the determination is that VA will not comply fully with the request or demand."  38 C.F.R. § 14.807(c).

23.    The VA's *Touhy* regulations do not create an independent privilege to withhold information or shield employees from valid discovery requests.  *See, e.g., Brown v. U.S. Dep't of Veterans Affs.*, 2017 WL 3620253, at *3 (N.D. Ala. Aug. 23, 2017) ("Application of *Touhy* regulations under § 301 is intended only to provide an orderly process by which a government agency may determine whether a demand for information from it is valid and lawful.  Such regulations by themselves do not create a privilege or otherwise authorize the withholding of information.").

24.    On August 2, 2022, pursuant to the VA's *Touhy* regulations, Medtronic sent its first written request for testimony and documents to the VA.  Medtronic followed the VA's regulations

---

of the United States, Medtronic has presented its requests in compliance with the VA's *Touhy* regulations rather than through the normal civil discovery process.

by providing a detailed summary of the nature and relevance of the testimony and records sought in the underlying *qui tam* action.

25.    The VA provided Medtronic with a written response to Medtronic's *Touhy* requests on October 4, 2022.  Although the VA produced certain documents responsive to one of Medtronic's seven document requests and permitted several depositions, the VA objected to the remaining document requests and refused to provide documents responsive to those requests.  In support of this determination, the VA cited certain factors as provided in 38 C.F.R. § 14.804, including the: (a) need to avoid spending the time and money of the United States for private purposes; (b) undue burdensomeness of the requests; (c) need to consider whether production of documents would violate a statute; and (d) need to minimize the VA's involvement in issues unrelated to its mission.  The VA also provided a time and cost estimate to produce the requested documents and information, claiming it would take thousands of hours and citing average costs of $10,000 to $40,000 for many of the requests.

26.    Relator, who also had certain *Touhy* requests denied, filed an action with the Court under the APA to compel the VA to produce the requested information.  *See Schroeder v. U.S. Dep't of Veterans Affs.*, No. 2:22-cv-2209-DDC-KGG, Dkt. No. 1 (D. Kan.) (filed June 7, 2022). In November 2022, Medtronic intervened in that action and likewise sought to compel production of documents responsive to its own requests.  *See id.*, Dkt. No. 19 (D. Kan.) (filed Nov. 7, 2022).

27.    In particular, Medtronic challenged the VA's refusal to provide documents responsive to its requests for: (1) "[a]ny documents, correspondence or analysis of the positive benefits of the Dole VA's treatment of peripheral vascular disease to the health and outcomes of veterans from 2011 to current"; (2) "[t]o the extent records relating to any patient procedures are provided to Relator," all documents related to "[t]he patient's medical condition at the time of the

peripheral vascular procedure"; and (3) "[t]he medical basis for treatment decisions for those patients made by physicians performing peripheral vascular procedures."

28.    Medtronic's requests were aimed at ensuring that—considering Relator's allegations in the *qui tam* action and Relator's *Touhy* requests—Medtronic would have access to information that could provide needed context for Relator's allegations and evidence and thereby effectively defend itself from Relator's accusations that Medtronic had caused unnecessary procedures and patient harm.

29.    Medtronic argued that the VA's refusal to produce the requested documents was arbitrary and capricious because: (1) the VA failed to consider relevant *Touhy* factors—particularly whether the production of documents was necessary in the underlying *qui tam* action; (2) the VA's reliance on certain *Touhy* factors was not rational; and (3) the VA failed to consider that Medtronic had no other means for obtaining the requested documents.

30.    The Court agreed with Medtronic that the VA's refusal to provide the requested documents was arbitrary and capricious. *Schroeder v. U.S. Dep't of Veterans Affs.*, No. 2:22-cv-2209-DDC-KGG, Dkt. No. 53 (D. Kan.) (filed May 16, 2023).

31.    The Court issued an Order remanding to the VA "for reconsideration of Medtronic's *Touhy* requests" in light of the Court's conclusion that the VA's refusal to produce the requested documents was arbitrary and capricious. *Id.* at 36.

32.    The Court's Order also required the VA to provide a supplemental response "within 30 days." *Id.* at 37.

33.    The Court then entered judgment and closed the APA case.

34.    On June 15, 2023, the VA responded to the remand decision through a letter to Medtronic outlining the records the VA would produce in light of the Court's May 16 Order. *See*

*Schroeder v. U.S. Dep't of Veterans Affs.*, No. 2:22-cv-2209-DDC-KGG, Dkt. No. 58-2 (D. Kan.) (filed June 15, 2023).  In the letter, the VA stated that it refused to produce documents related to the VA's own review of the patient care at issue in the *qui tam* action.  Without identifying the specific documents withheld, the VA stated that it would not provide any documents related to "the recent medical quality assurance review conducted at Dole VA" on the ground that those documents were protected under 38 U.S.C. § 5705.

### Medtronic's Additional *Touhy* Requests

35.     While the original APA action was ongoing, Medtronic learned of the existence of additional critical documents, including documents showing that the Dole VA conducted its own contemporaneous review and assessment of the interventional radiology procedures performed by WRG physicians in the peripheral vascular cath lab at the Dole VA.  Based on information and belief, these records will show that VA medical personnel charged with supervising the WRG physicians and the procedures at issue, and who had access to all available VA medical records, reviewed the procedures soon after they were performed and generally found them to be consistent with the VA's expectations, medically necessary and appropriate, and not responsible for causing any harm to patients.  The categories of documents identified include the following: (1) documents reflecting a post-litigation review of the procedures at issue; (2) documents reflecting contemporaneous monthly reviews of procedures at issue; (3) other contemporaneous quality assurance review documents; (4) documents showing the VA is still sending patients to WRG physicians for treatment; and (5) evaluations of WRG performance by the Dole VA.

**1.  The VA's "Extensive" Patient Care Review of Procedures Post-Litigation.**

36.     In February 2023, VA Press Secretary Terrence Hayes released a written statement in response to a public news report on the *qui tam* action.  In the statement, the VA stated, in part:

> VA is conducting an extensive review of patient care at [the Dole VA] – including the number of devices used on patients – to make sure that Veterans were not harmed by any procedures. To date, VA has found no quality of care issues. The investigation will continue until every Veteran's case has been reviewed.[2]

37.    The VA's public statement emphasized that, although the internal review was ongoing, "thus far, no safety issues or substandard care have been identified." As described above, this patient care review is known as the CERT review.

38.    The VA originally objected to Defendants' request for documents related to this review on the basis of 38 U.S.C. § 5705.

39.    In addition, although Medtronic's previous *Touhy* requests clearly covered these documents, the VA also took the position that the documents were not covered. To ensure production of these documents and out of an abundance of caution, on April 24, 2023, pursuant to the VA's *Touhy* regulations, Medtronic sent an additional written request for documents to the VA. In that request, Medtronic specifically sought documents relied upon, resulting from, or related to the review referenced by VA Press Secretary Hayes. In particular, Medtronic requested the following:

a.   Any documents, correspondence, or analyses reviewed in, relied upon, resulting from, and/or related to the "review of patient care" referenced in the Statement by VA Press Secretary Hayes.

b.   Any documents, correspondence, or analyses relied upon in making the following representations in the Statement regarding the results of the VA's review of patient care: "To date, VA has found no quality of care issues"; "Thus far, no safety issues or substandard care have been identified"; "Our review has not identified any substandard care"; and "However, to date we have not identified any substandard care, although our medical review is ongoing."

c.   In accordance with 38 CFR § 17.501(g), including the following subparts:

---

[2]   See https://www.documentcloud.org/documents/23602000-va-statement-kansas-case for Press Secretary Hayes' full statement.

i.  Subsection (g)(1), any statistical information available from the "review of patient care" referenced in the Statement to the extent such information does not implicitly or explicitly identify individual VA patients or VA employees or individuals involved in such review.

ii.  Subsection (g)(4), any records and documents developed during or because of Boards of Investigation relating to the "review of patient care" referenced in the Statement.

iii.  Subsection (g)(6), any records and documents that indicate the number of patients treated by a practitioner, either by diagnosis or in aggregate, or number of procedures performed by a practitioner, either by procedure or in aggregate, that were reviewed in, relied upon, resulted from, and/or related to the "review of patient care" referenced in the Statement.

d.  All documents, including any collected by Prevention of Amputation in Veterans Everywhere ("PAVE") or its predecessor, showing an increase in amputation rates associated with peripheral vascular disease after April 2018.

e.  All documents documenting the delay in interventional or invasive vascular procedures for Dole VA patients (or patients deemed to be within the Dole VA population) with peripheral vascular disease after April 2018, including angiograms and angioplasty.

f.  All documents showing the cost of interventional or invasive vascular procedures for Dole VA patients (or patients deemed to be within the Dole VA population) after April 2018, including but not limited to: costs associated with contracts with vascular surgeons to treat patients at the Robert J. Dole VA; costs associated with procedures conducted at external facilities for angiograms, angioplasty, bypass, or any other vascular surgical or interventional radiological procedure to treat vascular disease; and costs associated with purchase of medical devices by such external facilities to treat Dole VA patients (or individuals deemed to be within the Dole VA population).

40.  The VA did not respond to the April 24 *Touhy* requests for nearly six months, until October 17, 2023, when it finally responded.

41.  In its October 17, 2023 Response, the VA indicated that it would produce approximately 6 documents—two excel spreadsheets, three memoranda, and a table—in response to requests (b) and (c). These documents are all associated with the VA's April 2023 post-litigation CERT review of peripheral vascular procedures. According to the VA, this review involved all

219 invasive peripheral vascular procedures performed between 2015 and 2018 at the Dole VA. Contrary to Relator's allegations that Defendants were "butchering both legs" of veterans,[3] the CERT review found **_no_** evidence of patient harm attributable to Medtronic or WRG. Rather, the CERT review committee praised "the high level of technical proficiency" the WRG physicians showed in handling complex cases with significant comorbidities, and the physicians were credited with limb salvage in cases that otherwise would have resulted in amputation.

42.    As to device use, the report states that "the review did not substantiate concerns that providers were inappropriately or disproportionately using a specific commercial product from a specific vendor. Due to the complexity of the cases reviewed, a variety of products and devices were utilized including atherectomy devices, stents and balloons. In each case device selection was determined to be appropriately indicated by the clinical history and angiographic findings." Despite Relator's allegations of a years-long pattern of extensive fraud, the CERT Review committee found only about 5-7 cases out of 219[4] (*i.e.*, 2–3% of all cases) in which the committee seems to have *any* questions about device utilization, which plainly refutes Relator's claims.

43.    Yet, despite the obvious importance of these documents, the VA produced them with all patient-identifying information redacted, thus limiting Medtronic's ability to connect the data to previously produced patient files or other case information, such as the claims alleged to be false.

---

[3] Relator's Response to Defendants Medtronic, Inc. & Covidien, L.P.'s Motion to Dismiss Fifth Amended Complaint, ECF 261 at pg. 4, *United States ex rel. Schroeder v. Medtronic et al.*, Case No. 2:17-02060-DCC-BGS.
[4] *See* The United States Department of Veterans Affairs' Response in Opposition to Plaintiff's Motion For Leave to Supplement His Opening Brief, ECF 51, *Schroeder et al. v. U.S. Dep't of Vet. Affairs*, Case No. 22-cv-DDC-KGG.

44.     The VA also took the position that no other documents will be produced or are responsive to requests (a), (b), and (c).  Notably, this includes a refusal to produce the underlying medical records for the handful of cases reviewed by the VA review team and found not to meet the standard of care, even though the VA is simultaneously producing patient medical records to Relator.

### 2. The VA's Contemporaneous Monthly Reviews and Contemporaneous Quality Peer Reviews of Surgical Procedures.

45.     On May 4, 2023, Dr. Zubair Hassan, the Dole VA's Chief of Medicine, testified that WRG's procedures were also reviewed and assessed on a monthly basis by a committee at the Dole VA called the Invasive Operative Committee.

46.     According to Dr. Hassan, the Invasive Operative Committee is an interdepartmental committee that meets at the end of every month.  For radiology, the committee members would have included the Chief of Radiology, the Chief of Cardiology, the Director of the Cath Lab, managers from radiology, the chief technician from radiology, and technicians from other services.

47.     In the monthly reviews, the Committee would look at all procedures, identify any concerns or complications, and discuss whether any complications were "avoidable, unavoidable, or something could have been done."  If a complication was identified, the committee could also send the file to be reviewed by a hospital-wide peer review committee.

48.     Every peripheral artery disease ("PAD") procedure performed at the Dole VA would have gone through this review process.

49.     In addition to the monthly reviews, according to Dr. Hassan, the VA has other review committees that perform quality assurance or peer reviews, which includes "a process to review [interventional procedures] by an outside expert" of the same specialty "to make sure they met the standard of care."

50.     Dr. Hassan described the peer review process as "formal."  The committee assigns the procedures a ranking of Level 1, Level 2, or Level 3.  Level 1 is "would have done the same thing."  Level 2 is "somebody might have done differently." Level 3 is "most people might have done differently."

51.     If the Committee, which is chaired by the Dole VA's Chief of Staff, assigns a procedure a Level 1 ranking, discussion of that procedure is limited to the Committee.  If a Level 2 or Level 3 is assigned, the physician is notified and given a chance to respond or explain the medical decisions that were made.  After that, the committee conducts a final vote, and the majority vote determines the final level assigned to the procedure.

52.     If a physician receives a Level 3 ranking or a certain number of Level 2s, the physician is put on a monitoring plan and all of his or her cases are evaluated.

53.     The records from these review processes (both the monthly reviews and peer reviews) are critical evidence for evaluating both the alleged falsity of any claims for payment related to the reviewed procedures, as well as the materiality of the facts at issue to the VA's determination to continue to work with WRG and buy medical supplies from Medtronic.  In addition, this information remains highly relevant even after the CERT review was produced, for several reasons.  First, to the extent Relator seeks to challenge the credibility of the VA's conclusions in the CERT review, these contemporaneous records will help refute any such challenge by showing the VA reached the same conclusions at the time.  Second, the CERT review did not include at-issue procedures that took place between 2011 and 2015, whereas the contemporaneous reviews would have occurred throughout that time period as well.

54.     Although Medtronic's previous *Touhy* requests discussed above clearly covered documents related to these contemporaneous reviews, the VA claimed the documents had not been

requested. Therefore, on July 20, 2023, Medtronic submitted another written *Touhy* request to the

VA, specifically asking for any contemporaneous review records, including those described above.

Specifically, the July 20 request sought:

   a. Minutes or other similar records documenting or describing monthly meetings of Dole VA Invasive Operative Committee (as identified by Dr. Hassan in his May 2023 Deposition) for meetings occurring from January 1, 2011, through December 30, 2018. To the extent it is less burdensome for the VA, Medtronic and WRG are willing to limit the request to review of just those procedures performed by Dr. Gonda, Dr. Winblad, Dr. Baalman, or Dr. Rust from 2011 to 2018.

   b. Records sufficient to identify the members of the interdepartmental Invasive Operative Committee (as identified by Dr. Hassan in his May 2023 Deposition) from 2011 to 2018.

   c. Records identifying physicians in the Wichita area performing PAD procedures from April 2018 to present date as part of the Dole VA's Community Care program. This includes documents showing that WRG is performing approximately 80% of Community Care procedures for Dole VA patients.

55.    On August 11, 2023, the VA provided Medtronic with a written response to

Medtronic's July 20, 2023 *Touhy* request. The VA objected to providing records related to the

monthly Invasive Operative Committee reviews. In support of its determination, the VA cited one

factor provided in 38 C.F.R. § 14.804: "[t]he need to minimize VA's possible involvement in

issues unrelated to its mission." *See* 38 C.F.R. § 14.804(*l*). However, if the VA deems this case

inconsistent with its mission, the case should be dismissed rather than pursued through an outside

*qui tam* relator.

56.    The VA also objected to Medtronic's first two requests on the ground that "the

records requested are protected by 38 U.S.C. § 5705." The VA did not produce any privilege log

to substantiate that subsequent objection. Additionally, the VA appears to be improperly

selectively waiving any privilege associated with VA medical reviews of these procedures.

### 3. The VA's Performance Reviews of WRG Physicians.

57.     As contractors to the VA, the physicians from WRG performed their services pursuant to the terms and requirements of contracts executed during the relevant time frame. Contracts produced during discovery indicate that physician privileges at the Dole VA facility were predicated on the physicians undergoing quarterly performance reviews and achieving satisfactory approval ratings.

58.     For example, the contract executed in 2015 states that "[c]ontract physician(s) shall be subject to Quality Measurement measures, such as patient satisfaction surveys, timely completion of medical records, and Peer Reviews" and explains that their "performance shall be monitored by the government using the standards outlined" in the contract. This includes quarterly review of "provider quality performance" and a requirement that they "100% meet standards," and quarterly reviews of patient safety incidents.

59.     Like the contemporaneous review records described above, the records of the VA's performance reviews of WRG physicians, as well as information about who and what was reviewed, is critical evidence in this case because it provides contemporaneous evidence of the VA's knowledge and approval of the contract services it received and paid for.

60.     On July 12, 2023, Medtronic sent a *Touhy* letter to both the VA and the United States Department of Justice reiterating its prior request for the documents identified in this complaint. Medtronic stated that it was requesting each of these categories of documents pursuant to the VA's *Touhy* regulations.

61.     Among other things, this letter included a specific request for the Quarterly Reviews of the WRG physicians. The VA has inexplicably refused to acknowledge this request from Medtronic, and it has accordingly refused to correspond with Medtronic about these

documents.  The VA has, however, acknowledged a request from WRG for these same records, and, on October 6, 2023, the VA produced to WRG a small number of responsive Quarterly Reports.

62.     Upon review of the small number of documents the VA produced to WRG on October 6, both Medtronic and WRG jointly responded on October 9, 2023, identifying a number of deficiencies and concerns with the VA's production.  These included:

a.  The VA redacted critical information, including the identity of individual reviewers with first-hand knowledge of the records, as well as patient data;

b.  The production reflected missing pages;

c.  The production raised significant questions about the VA's preservation of documents, as many quarterly reviews, including entire years, were missing.

63.     On October 16, 2023, the VA responded solely to WRG, again omitting Medtronic's counsel from the correspondence.  In the letter to WRG, the VA declined to remove its redactions.  The VA also took the disturbing position that it was entitled to destroy the relevant documents under its Records Control Schedule (RCS) 10-1, because four years had passed since 2018 and thus, pursuant to its document retention policies, the records could have been destroyed no earlier than 2022.  The VA failed to provide any explanation for this position in light of (a) its notice of Relator's allegations since 2017, and (b) its own internal VA OIG investigation that began no later than 2018, both of which have been acknowledged by the United States Attorney's Office and/or employees of the VA.  The VA refused to respond to any further questions about its retention or destruction of these documents on the ground that such information was not "records or testimony."

64.     While Medtronic cannot seek documents that no longer exist, Medtronic does request an Order that (i) reflects Medtronic's entitlement to the records pursuant to its request, (ii)

requires the VA to produce unredacted documents, and (iii) requires the VA to provide information as to what documents were destroyed and when.  The significance of the VA's potential spoliation of evidence that it had a duty to preserve will be litigated in the FCA matter.

### 4. The VA's Ongoing Referrals to WRG Physicians.

65.    Evidence reflects that a business analyst with no medical background conducted a review at the Dole VA in 2018 and concluded that the Dole VA was spending too much to treat veterans with serious PAD conditions.  The VA has represented that it temporarily closed the catheterization lab at the Dole VA in 2018 in response to this business review.  Following that closure, VA patients needing peripheral vascular treatment were referred to outside non-VA hospitals in the Wichita area through the VA's Community Care Network (VA CCN).

66.    As part of Medtronic's July 20, 2023 Request, Medtronic specifically sought information on the VA's outside referrals to WRG after 2018.  These requests seek relevant information because, while Relator alleges that the lab closure related to medically unnecessary care rendered by WRG, a VA official informed Defendants that the treating physicians in 80% of the VA CCN peripheral vascular referrals were WRG physicians.  This reality suggests that even after 2018, the VA had no qualms about having its patients continue to receive their treatment from WRG.

67.    When the VA responded on August 11, 2023, it stated that responsive documents could be obtained for $304.24.  On October 5, 2023, counsel for Medtronic twice requested information on how to remit payment for these records.  However, while the VA responded to other questions within this correspondence, it repeatedly failed to provide instructions for remitting payment.  The VA's unexplained refusal to provide the necessary instructions for remitting payment amounts to a constructive denial of Medtronic's request for these records.

**5.  Chart of Medtronic Request and VA Responses.**

68.    The following chart summarizes Medtronic's *Touhy* requests that remain at issue and the VA's responses to those requests:

| Request Date | Nature of Request | Response Date | VA Response |
|---|---|---|---|
| Aug 2, 2022 | 2:  Documents on the positive benefits of the Dole VA's treatment of peripheral vascular disease to the health and outcomes of veterans from 2011 to current. | October 4, 2022. -- June 15, 2023 | Objected. -- $40,000, to review medical records. Won't produce other reviews, citing 38 U.S.C. § 5705 |
| April 24, 2023 | 1:  A sworn declaration indicating that their press statements are a true and accurate copy of the VA's comments. | Oct. 17, 2023 | No responsive documents |
| April 24, 2023 | 2:  Documents related to the "review of patient care" referenced in the Statement by VA Press Secretary Hayes. | Oct. 17, 2023 | 46 pages with redactions; incomplete production. |
| April 24, 2023 | 3:  Documents relied upon in making the following representations: "To date, VA has found no quality of care issues"; "Thus far, no safety issues or substandard care have been identified"; "Our review has not identified any substandard care"; and "However, to date we have not identified any substandard of care, although medical review is ongoing." | Oct. 17, 2023 | 46 pages with redactions; incomplete production. |

| Request Date | Nature of Request | Response Date | VA Response |
|---|---|---|---|
| April 24, 2023 | 4:  Information that is not privileged under 38 CFR § 17.501(g), including:<br><br>- (g)(1) Any statistical information available from the "review of patient care" referenced in the Statement<br>- (g)(4)  Documents developed during or as a result of Boards of Investigation relating to the "review of patient care" referenced in the Statement.<br>- (g)(6) The number of patients treated by a practitioner, either by diagnosis or in aggregate, or number of procedures performed by a practitioner, either by procedure or in aggregate, that<br>- were reviewed in, relied upon, resulted from, and/or related to the "review of patient care" referenced in the Statement. | Oct. 17, 2023 | 46 pages with redactions; incomplete production. |
| April 24, 2023 | 5:  Any documents, including any collected by Prevention of Amputation in Veterans Everywhere ("PAVE") or its predecessor, showing an increase in amputation rates associated with peripheral vascular disease after April 2018. | Oct. 17, 2023 | Cited cost of $20,814 |
| April 24, 2023 | 6:  Documents showing a delay in interventional or invasive vascular procedures for Dole VA patients with peripheral vascular disease after April 2018, including angiograms and angioplasty. | Oct. 17, 2023 | Cited cost of $15,609 |
| April 24, 2023 | 7:  Documents showing the cost of interventional or invasive vascular procedures for Dole VA patients (or patients deemed to be within the Dole VA population) after April 2018. | Oct. 17, 2023 | Objected pursuant to FOIA exemption 4, "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." |

| Request Date | Nature of Request | Response Date | VA Response |
|---|---|---|---|
| July 12, 2023 | Quarterly Reviews of WRG Performance | None | Refuses to Acknowledge Medtronic's request.<br><br>*Response to WRG Oct. 6 and 16, 2023. |
| July 12, 2023 | Invasive Operative Committee Records, Notes, or Reports. | None | *Denied in Aug. 11, 2023 Response |
| July 12, 2023 | Contemporaneous Peer Review Documents from 2011 to 2018. | None | *Denied in June 15, 2023 and Aug. 11, 2023 |
| July 20, 2023 | 1:  Minutes or Other Similar Records Documenting or Describing Monthly Meetings of Dole VA Invasive Operative Committee (as identified by Dr. Hassan in his May 2023 Deposition) for Meetings occurring from January 1, 2011, through December 30, 2018. To the extent it is less burdensome for the VA, Medtronic and WRG are willing to limit the request to review of just those procedures performed by Dr. Gonda, Dr. Winblad, Dr. Baalman, or Dr. Rust from 2011 to 2018. | Aug. 11, 2023 | Cited cost of $304.24;<br><br>Won't produce, citing 38 U.S.C. § 5705 |
| July 20, 2023 | 2. Records sufficient to identify the members of the interdepartmental Invasive Operative Committee (as identified by Dr. Hassan in his May 2023 Deposition) from 2011 to 2018. | Aug. 11, 2023 | Cited cost of $76.06;<br><br>Won't produce, citing 38 U.S.C. § 5705 |
| July 20, 2023 | 3.  Records identifying physicians in the Wichita area performing PAD procedures from April 2018 to present date as part of the Dole VA's Community Care program. This includes documents showing that WRG is performing approximately 80% of Community Care procedures for Dole VA patients. | Aug. 11, 2023 | Cited cost of $304.24.<br><br>No response to efforts to make payment. |

**The VA Has Arbitrarily and Capriciously Withheld Information and Documents that are Responsive and Relevant.**

69.     As this Court has already recognized in *Schroeder v. U.S. Dep't of Veterans Affs.*, No. 2:22-cv-2209-DDC-KGG, Dkt. No. 53 (D. Kan.) (filed May 16, 2023), the VA is in possession of highly relevant—and potentially dispositive—documents relating to the allegations made by Relator on behalf of the United States against Medtronic and WRG.  Relator is challenging the medical necessity and propriety of procedures and products used by WRG at the Dole VA, as well as claiming that Medtronic is somehow responsible for defrauding the VA in connection with these procedures.  To rebut Relator's false and inflammatory allegations, Medtronic must have access to evidence in the sole custody of the Dole VA that will prove the VA determined that the procedures at issue were medically necessary, appropriate, and in accordance with the work WRG physicians were paid by the VA to perform, which means Medtronic did not cause submit or cause the submission of any false or fraudulent claims.

70.     Thus, the documents and information Medtronic seeks are directly relevant to the underlying False Claims Act case, *U.S. ex rel. Schroeder v. Medtronic, Inc., et al.*, No. 2:17-cv-02060-DCC-BGS.  Not only is the United States the real party in interest in the False Claims Act matter, but the discovery sought relates to highly relevant issues such as (1) the patient care actually rendered, (2) the VA's own knowledge and assessment of the services and products at issue, and (3) the lack of damage or harm to the VA.  Medtronic is entitled to defend itself against Relator's allegations and to obtain evidence showing that the United States, through the VA, was not defrauded.

71.     In light of these interests and the Court's prior Order permitting the production of unredacted documents consistent with the Privacy Act, the VA's withholding of information and redaction of documents based on supposed privacy concerns is arbitrary and capricious.

72.     Likewise, the VA's refusal to produce documents showing the cost of community care after the cath lab was closed in 2018, based on assertions that it is "trade secret and commercial or financial information," is without basis and should be overturned.

73.     Furthermore, the VA's apparent destruction of relevant and responsive documents that it had a duty to preserve, and its refusal to provide information about how these documents were maintained and how and when they were destroyed, is arbitrary and capricious.

74.     The VA has also been unwilling to acknowledge certain of Medtronic's requests, even as it has cooperated with other parties to the litigation.   For example, the VA has communicated with WRG regarding WRG's request for records of the VA's performance evaluations of WRG physicians, but it refuses even to acknowledge Medtronic's request for those same records.   Likewise, the VA has worked with other parties to accept payment and deliver documents.   However, when Medtronic sought to engage in the same process on October 5, 2023, its requests were literally ignored.   The VA's actions in this regard amount to a constructive denial of Medtronic's legitimate requests that is unexplained, unreasonable, and arbitrary and capricious.

### The VA Has Never Identified Nor Produced Responsive, Relevant Information or Evidence to Substantiate the Assertion of Privilege

75.     As described above, the VA has also refused to produce certain surgical review records based on its assertion that those records are privileged under 38 U.S.C. § 5705.   Section 5705 provides that, subject to various exceptions, "[r]ecords and documents created by the Department as part of a medical quality-assurance program … are confidential and privileged." *Id.* § 5705(a).   The VA has adopted a regulation to further define the conditions under which this privilege may be invoked.   *See* 38 C.F.R. § 17.501.

76.     Despite invoking this privilege as the basis for denying Medtronic's *Touhy* requests, the VA has never provided any information that would substantiate its assertion of the

privilege.  As the party asserting a privilege, the VA has the burden to show that the privilege applies.  *Epling v. UCB Films, Inc.*, 2000 WL 1466216, at *19 (D. Kan. Aug. 7, 2000). This requires a "clear showing" that the withheld information is privileged.  *Id.*

77.    Under Fed. R. Civ. P. 26(b)(5), the VA:

> shall make the [privilege] claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.

78.    Just as with any other privilege, the "VA, as the party asserting privilege, must 'provide sufficient information to enable the plaintiff[] and the court to determine whether each element of the asserted objection is justified.'"  *Bethel v. U.S. ex rel. Veterans Administrative Medical Center of Denver, Colo.*, 242 F.R.D. 580, 584 (D. Colo. 2007) (rejecting VA's assertion under the quality assurance privilege) (citing *Atteberry v. Longmont United Hosp.*, 21 F.R.D. 644, 648 (D. Colo. 2004)).  Federal discovery rules favor the full disclosure of facts before trial to support the search for truth.  *See Wei v. Bodner*, 127 F.R.D. 91, 96 (D.N.J. 1989).  Accordingly, evidentiary privileges are disfavored and are "not lightly created nor expansively construed." *United States v. Nixon*, 418 U.S. 683, 710 (1984).

79.    These principles are fully applicable when an agency refuses to produce documents in response to a *Touhy* request based on an assertion that the documents are privileged.  The APA requires that such a refusal be both reasonable and reasonably explained, which requires the agency to "articulat[e] an explanation establishing a rational connection between the facts found and the choice made." *Schroeder v. U.S. Dep't of Veterans Affs.*, No. 2:22-cv-2209-DDC-KGG, Dkt. No. 53, at 12 (D. Kan.) (filed May 16, 2023) (quoting *Brown v. U.S. Dep't of Veterans Affs.*, No. 2:17-cv-1181-TMP, 2017 WL 3620253, at *5 (N.D. Ala. Aug. 23, 2017)).  A bare assertion of privilege, without any supporting facts or explanation, does not suffice.

80.     The privilege on which the VA relied applies only when specific statutory and regulatory requirements are met.  *See* 38 U.S.C. § 5705; 38 C.F.R. § 17.501.  The VA's own regulation identifies four specific categories of documents to which the narrow privilege will apply.  38 C.F.R. § 17.501(a).  The VA has also issued directives providing further guidance on the specific conditions required for reviews to qualify under this privilege.  *See, e.g.,* VHA Directive 1190; VHA Directive 1320.[5]

81.     The VA has not provided a rational explanation to support its bare assertion that the privilege applies here.  The VA did not provide facts sufficient to establish *any* element of the asserted privilege, let alone *all* elements.  Instead, the VA simply stated that it objected to producing the records at issue pursuant to § 5705.  The VA has not provided a list of documents, a description of the documents, information about the circumstances surrounding the creation of the documents, or any of the other types of information a privilege log would typically disclose.  Nor has the VA even identified under which regulatory category it contends the withheld documents fall.  *See, e.g., Bethel*, 242 F.R.D. 580 (reviewing privilege log to determine whether VA met its burden to show that the documents listed fell within a category protected by quality assurance privilege).  Without these details, the Court lacks any factual basis upon which to find that the § 5705 privilege applies, and the VA's refusal to produce the documents at issue is therefore arbitrary and capricious.

82.     The VA's refusal to produce the records at issue was also arbitrary, capricious, and contrary to law because, assuming for argument's sake that any of those records could have been

---

[5] Dept. of Veterans Affairs, *Peer Review for Quality Management*, VHA Directive 1190 (Nov. 21, 2018); Dept. of Veterans Affairs, *Quality Management and Patient Safety Activities That Generate Confidential Records and Documents*, VHA Directive 1320 (Jul. 10, 2020).

deemed privileged under § 5705, the United States has waived any privilege that might have applied.

83.    First, the United States waived any privilege by failing to assert it in a timely fashion.  In its first *Touhy* request, Medtronic requested favorable reviews of the peripheral vascular procedures performed by WRG at the Dole VA.  It was only after the prior litigation and this Court's Order that the VA asserted, for the first time, a privilege under § 5705.

84.    Second, and most importantly, the United States waived any privilege by allowing the Relator, who by law is the United States' statutory agent, to pursue on the United States' behalf claims against Medtronic for which the records at issue are critical, potentially exculpatory evidence.  The United States is the real party in interest in every *qui tam* action under the False Claims Act.  *See U.S. ex rel. Polansky v. Exec. Health Res., Inc.*, 143 S. Ct. 1720, 1728 (2023) (citing *U.S. ex rel. Eisenstein v. City of N.Y.*, 556 U.S. 928, 930 (2009)).  As such, the United States bears responsibility for the prosecution of any such action: It has the power to (i) intervene and take control of litigation of the action, (ii) decline to intervene and allow the relator to pursue the action on its behalf, or (iii) dismiss the action.  And when the United States declines to intervene or dismiss the *qui tam* action and allows the relator to pursue the action, the relator does so as the United States' agent.  *See, e.g.*, *U.S. ex rel. Hyatt v. Northrop Corp.*, 91 F.3d 1211, 1215 (9th Cir. 1996) ("Qui tam plaintiffs are merely agents suing on behalf of the government, which is always the real party in interest."); *U.S. ex rel. Amin v. George Washington Univ.*, 26 F.Supp.2d 162, 168 n.1 (D.D.C. 1998) (a qui tam relator "merely acts as the United States' agent in pursuing the claim").

85.    Here, Relator's *qui tam* action on behalf of the United States makes claims for which the supposedly privileged records are critical to Medtronic's defense.  Relator alleges, in

part, that Medtronic violated the False Claims Act by presenting, or causing to be presented, claims that are false because Medtronic purportedly caused WRG physicians to perform medically unnecessary peripheral vascular procedures using Medtronic products.  Relator claims the WRG procedures were "not medical treatment" but were instead "abuse" for which there could "be no valid medically acceptable basis."  *See U.S. ex rel. Schroeder v. Medtronic, Inc., et al.*, No. 2:17-cv-02060-DCC-BGS, ECF No. 32, at 19.

86.     These inflammatory allegations place in issue the VA's own evaluation of the medical procedures in question.  The services provided to the VA were pursuant to agreement and expectations established as between the Defendants and the VA.  Accordingly, the VA's expectations, knowledge, and assessment of performance of the medical procedures and products at issue is critical to understanding whether the claims submitted were, in any way, "false."

87.     Where the Government itself has knowledge of the goods or services it received and has found them satisfactory, there can be no "fraud."  Likewise, if the government and a contractor are "working together," or if the government had "knowledge and acquiescence in its contractor's actions," no false claim has occurred.  *See, e.g.*, *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 682 (5th Cir. 2003) (Jones, J., specially concurring) (citing *United States ex rel. Becker v. Westinghouse Savannah River Co*., 305 F.3d 284, 288–89 (4th Cir. 2002); *United States ex rel. Lamers v. Green Bay*, 168 F.3d 1013, 1019–20 (7th Cir. 1999); *United States ex rel. Butler v. Hughes Helicopters, Inc*., 71 F.3d 321, 326–27 (9th Cir. 1995).

88.     Thus, any documents that reflect the VA's assessment of or satisfaction with the care provided are critical to determining whether the VA was defrauded or, alternatively, whether the VA (i) received the benefit it sought, and/or (ii) knew all material information and paid claims anyway.

89.     Because the evidence sought goes directly to the VA's knowledge and assessment of the procedures at issue, the evidence may be dispositive, in whole or in part, of Relator's claims. Furthermore, based on documents and testimony received to date, Medtronic has good reason to believe the evidence will show that medical professionals reviewed the at-issue procedures and were satisfied with the services and products that were provided.  The evidence is also likely to identify witnesses with additional critical and exculpatory evidence.  This evidence would disprove the allegations asserted against Medtronic in the *qui tam* action Relator has brought on behalf of the United States.

90.     The United States cannot allow the Relator, as its statutory agent, to pursue claims against Medtronic on its behalf that allege that the procedures at issue were medically unnecessary and improper, and that the VA was defrauded with respect to those procedures, while simultaneously invoking a privilege to shield critical contrary evidence from discovery.  It is axiomatic that a party cannot use a privilege as both a sword and a shield.  Accordingly, a party waives a privilege if that party, either directly or through its agent, "injects into [a] case an issue that in fairness requires an examination of otherwise protected communications."  *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1419 (11th Cir. 1994).

### Allowing Relator to Pursue Claims Against Medtronic While Withholding Critical Contrary Evidence Would Also Violate Medtronic's Right to Due Process of Law

91.     In addition, under the Fifth Amendment to the United States Constitution, the United States cannot bring an enforcement action (including through a relator as its statutory agent) while simultaneously shielding from discovery exculpatory evidence that would rebut its claims. *See, e.g., ASSE Intern., Inc. v. Kerry*, 803 F.3d 1059, 1073-79 (9th Cir. 2015) (holding that State Department could not issue sanctions against a third-party administrator to a cultural exchange

program without complying with due process, which included access to evidence and a meaningful opportunity to rebut the allegations).

92.     On behalf of the United States, the *qui tam* action seeks to deprive Defendants of a significant property interest.  Relator has indicated that he will request, on behalf of the United States, a judgment from Defendant exceeding $356 million, the vast majority of which consists of punitive statutory trebling and penalties.

93.     The *qui tam* action also puts at issue Medtronic's constitutionally protected liberty interests in the form of reputational and stigmatic harms.  On behalf of the United States, based on the mere assertion of his fraud allegations, Relator has already engaged in a significant campaign to try to harm Medtronic's standing with government officials and the public.  The accusations of fraud and "butchering" veterans, which are driven by Relator's self-admitted desire to harm Medtronic's stock price, threaten lasting damage to Medtronic's reputation and goodwill.  The judgment sought against Medtronic would further harm these constitutionally protected liberty interests.

94.     Laws like the False Claims Act "impose penalties far more severe than those found in many criminal statutes."  *Sessions v. Dimaya*, 138 S. Ct. 1204, 1229 (2018) (Gorsuch, J., concurring in part and concurring in judgment).  As Justice Gorsuch has explained:

> Ours is a world filled with more and more civil laws bearing more and more extravagant punishments.  Today's "civil" penalties include confiscatory rather than compensatory fines, forfeiture provisions that allow homes to be taken, remedies that strip persons of their professional licenses and livelihoods, and the power to commit persons against their will indefinitely.  Some of these penalties are routinely imposed and are routinely graver than those associated with misdemeanor crimes—and often harsher than the punishment for felonies.

*Id.*  Although not specifically discussing the False Claims Act, Justice Gorsuch's comments fully apply in this context.

95.     The United States' refusal to produce critical and likely exculpatory evidence in the government's possession, while simultaneously seeking, through its statutory agent, hundreds of millions of dollars from Medtronic based on related allegations, is fundamentally unfair and violates Medtronic's right to due process of law.

96.     To avoid violating Medtronic's constitutional rights, the Court should carefully scrutinize the VA's dubious assertions of privilege.  If the Court determines after a careful review that the privilege does not apply or has been waived, then the Court will not need to confront the due process violation.  The Court should therefore apply the statute, regulations, and background waiver rules with principles of constitutional avoidance in mind.

## COUNT I

### Administrative Procedure Act Claim
### Against U.S. VA

97.     Medtronic incorporates by reference each of the preceding paragraphs as if set forth fully herein.

98.     Medtronic brings this claim pursuant to § 706(2)(A) of the APA, which states that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be – arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *See, e.g.*, *Rhoads v. U.S. Dep't of Veterans Affs.*, 242 F.Supp.3d 985, 990 (E.D. Cal. 2017) ("It is well established that once an agency has taken final agency action under the APA, a reviewing court analyzes that decision under the 'arbitrary and capricious' standard of review.").

99.     The VA's refusal to produce the above-referenced documents and information is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in that, among other things:

a.  The VA's decision failed to consider relevant factors under 38 C.F.R. § 14.804, *e.g.*, (e) whether production of documents is appropriate or necessary in the underlying action, where Medtronic seeks documents that are case-critical— indeed, potentially dispositive—to the *qui tam* action.

b.  The VA's reliance on certain factors in making its decision was not rationally based.  In particular, its reliance on 38 C.F.R. § 14.804(*l*) for the assertion that "[t]he diversion of resources to meet [Medtronic's] *Touhy* request would directly impact the mission and operation of the [VA]" is not rational when responding to Medtronic's requests would not require extensive use of resources, Medtronic would pay the costs associated with the response, and the VA's mission of serving veterans is advanced by ensuring that claims regarding the care provided to veterans at the Dole VA are fully addressed based on all relevant evidence.

c.  The VA's decision does not consider or address the burdens of its production in relation to the critical—and potentially dispositive—importance and relevance of the requested documents and information to Medtronic's defenses in the *qui tam* action.

d.  The VA's decision does not consider or address the fact that Medtronic has no other means for obtaining the requested documents and information from any other source besides the VA.

e.  The VA cannot meet the requirements for and/or has not properly asserted the privilege set forth in 38 U.S.C. § 5705.

f. The United States, by and through the VA, has waived the privilege by failing to assert it, by publicly disclosing certain facts, and by allowing its statutory agent to pursue FCA claims that are contrary to documents in its possession.

g. If the United States, by and through the VA, refuses to produce the documents sought, the United States and its statutory agent should be barred from pursuing claims against Medtronic for which those documents are critical to Medtronic's defense.

h. The United States' refusal, by and through the VA, to produce the documents sought, while continuing to allow its statutory agent to pursue claims against Medtronic for which those documents are critical evidence, violates Medtronic's right to due process of law under the U.S. Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Medtronic respectfully requests that this Court:

A. Issue a declaratory judgment holding that the VA's refusal to produce the documents and information sought in Medtronic's *Touhy* requests was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

B. Issue a declaratory judgment holding that refusal to produce the documents and information sought in Medtronic's *Touhy* requests, while continuing to pursue (through the United States' statutory agent) the related claims against Medtronic, violates Medtronic's constitutional right to due process;

C. In the event the VA will not or cannot provide the documents or information at issue, permanently restrain or enjoin the prosecution, on behalf of the United States, in *U.S. ex rel. Schroeder v. Medtronic, Inc., et al.*, 2:17-cv-02060-DCC-KGG, of the related claims;

D.  Award any damages, attorney's fees, costs, and expenses of all litigation as allowed by

    law;

E.  Grant all such other and further relief as the Court may deem just and proper.

November 8, 2023                          Respectfully submitted,


                                      *s/ Robert J. McCully*

                                      Robert J. McCully (KS #12433)
                                      SHOOK, HARDY & BACON L.L.P.
                                      2555 Grand Blvd.
                                      Kansas City, MO 64108
                                      Phone: (816) 474-6550
                                      Fax : (816) 421-5547
                                      Email: rmccully@shb.com

                                      *Attorneys for Plaintiff Medtronic, Inc.*